The first case today is number 141692 United States v. Manuel Cejesus-Rosario-Perez Number 141870 United States v. Jorge Gomez-Gonzalez Number 1419 United States v. Brian Teruano-Toronto And number 142098 United States v. Santiago Hernandez-Rosa Good morning, Your Honor. Good morning. Rafael Castellan, representing Appellant Jorge Gomez-Gonzalez. Your Honor, since I will be arguing three appeals, I would respectfully request that I be notified once my ten-minute period is up so that I'm aware that I need to then go on to the other appellants. We'll try to do that. But don't worry too much about it. Okay. Thank you, Your Honor. Now, throughout the many years of government interventions in La Perla, the taking of videos for six months, the introduction of informants who made undercover narcotics purchases, they had even one informant that was specifically ordered to target Gomez-Gonzalez. Not one gram of narcotics, no one arrest was made of Gomez-Gonzalez throughout the 12-year history of the conspiracy. At trial, not one bag of the Chalky or George Washington brand of narcotics allegedly sold by Gomez-Gonzalez were presented in evidence. None of the cooperating witnesses ever worked for Gomez-Gonzalez selling drugs. To admit to the court where the conviction evidence rested on the uncorroborated testimony of cooperating witnesses, if credibility was highly dubious, the errors that have been raised cannot be considered harmless. All three assignments of error raised in the brief justify setting aside Gomez-Gonzalez's conviction under the cumulative error doctrine. I would like to address the more egregious errors that I find in the case. And the first one is the court's provision of an instruction that Gomez-Gonzalez had in the past committed acts similar to the one charged in the indictment. Just as the Supreme Court in Richardson recognized that the testimony of a co-defendant implicating another defendant at trial could not be cured by a limiting instruction, I submit to the court that a judge informing a jury that the parties had stipulated that Gomez-Gonzalez had committed similar acts to the ones charged in the indictment is the type of comment that cannot also be erased by a limiting instruction. In this particular case, the judge even violated his own statements as to what he was going to do when that particular instruction was going to be given. And at page 1983 of the appendix, the judge stated that he clarified that a limiting instruction will be provided even prior to the evidence coming in. This is being reviewed on plain error, right? There's no objection? Well, there was objection. There was? With all due respect, not only that, the judge stated that the objection was preserved even with the stipulation. Yes, this was objected. And it is preserved in the record. The judge- This is the 404B evidence that ultimately did not come in? Well, it came in- I'm just trying to get a handle on whether there was actually- We're talking about the- Excuse me one second. I'm trying to orient myself to make sure I know which issue we're talking about. I thought there was not an objection to this. Is there a dispute about whether there's an objection? Well, I think the record in my brief clearly establishes that there was an objection. And, in fact, the judge even stated, even though you're stipulating you preserved your objection to the record, so there was an objection in this case. Yes, I'm referring to the 404B, that the prosecutor conveniently allowed the judge to inform that Gomez-Gonzalez had engaged in prior criminal acts similar to those charged in the indictments, and then withdrew it. Your Honor, the district court judge, here the prejudice is double. Obviously, a jury hearing that Gomez-Gonzalez had committed acts similar definitely had to prejudice him. And when you consider that he was acquitted in all counts except the conspiracy count, that cannot be excluded as having affected the verdict. What's worse is that the judge did not even follow what he had said he was going to do, that prior to giving that instruction, he was going to inform the jury that the only purpose for which you could consider the evidence of prior similar acts relating to one out of the three predicates, and that even if you find a defendant committed a similar act in the past, this court instruction is not to be considered evidence of character. None of that was given. This jury was just told, I'm instructing you, that this defendant committed prior acts similar to those charged in the indictment. And then when the prosecutor announces that he's not going to use that evidence, then he says, at this time, at this time, you're to disregard the instruction. Well, no. That is, to begin with, that is an insufficient limiting instruction. He should have told them that it is to be disregarded completely and not taken into account. That was not done. So there was no evidence of the specific prior bad act, right? Well, that's even worse because the conviction was 24 years old prior to the trial, over 10 years prior to the conspiracy beginning. So the jury wasn't told what the prior conviction was, right? Well, they were informed that he had committed prior similar acts to those charged in the indictment. Now, that a particular conviction was made reference to, no, it wasn't. I submit that the general instruction given is worse than if a particular instruction had been given, and the jury's seen why we're being asked to take into account something that happened 24 years ago. So it's even worse. What happened is worse than if the complete instruction with the limiting instruction that they're supposed to give, that he said he was going to give, would have been given. So that's one of the errors that I believe affected the verdict in this case. The second one is the allowance of paid government informer Osvaldo Gomez to testify that for Gomez-Gonzalez's work. An objection was raised repeatedly with Counsel Regoio that the government had not laid a sufficient foundation for that testimony to come in as a co-conspirator statement. So I thought the objection was not that there was an inadequate Petrozzillo finding, but rather that the statement was not in furtherance of the conspiracy. Do I misunderstand that one, too? That's correct. What you're saying is correct. Okay. He objected that the government had failed to establish a sufficient evidentiary foundation. Oh, on the prong of further, okay. To allow it as a co-conspirator statement. And it was insufficient, because what did Osvaldo Gomez say? That he met this resident of La Perla, Joanne Ducasa, who told him that she was involved. No explanation as to what her involvement was, with whom. That he then mentioned something about being interested in working, and she said, well, maybe you should talk to some Dominican that wasn't named. And then he asked, what did she say about other members of the conspiracy? Oh, that the drugs of the organization were being brought to the peers. That had nothing to do with the conversation that was being taken. It was not in furtherance of the conspiracy. And I submit that the judge was rather loose in admitting it as a co-conspirator statement, merely because the informant said she admitted that she was involved. Ducasa wasn't even indicted. Ducasa was never mentioned by any of the co-conspirators that lived there as being a participant in the conspiracy, which even worse, Cascote, who was the big shot there, worked at the peers. And Cascote never testified that drugs that were being sold in La Perla were coming into the peers. The damage here, the improper admission of this hearsay evidence, is clear because Gomez Gonzalez presented extensive testimony of his legitimate employment at the peers for years. And with this hearsay statement, the government was able to convert that legitimate employment evidence as evidence of drug trafficking. What did he work at? What did he do at the peers? Does the record show what he did at the peers? Yes. Several witnesses testified as to his punching the records of his working there as a steamsword. That wasn't my question. My question is what kind of work did he do at the peers? A steamsword. He was a steamsword. Yes. Okay. And there was extensive evidence, in fact, that that was his legitimate employment. And then what do you do? This idle chatter, because that's the only way you can consider that statement is idle chatter, was allowed to hear that the drugs being sold in La Perla were coming into the peers.  And it was inadmissible evidence as it wasn't admissible as a co-conspirator statement. Now, the third error was the district court failing to allow Gomez Gonzalez to present all of the evidence concerning his legitimate employment. Are you talking about the newspaper accounts? Not just newspaper accounts. No, there were hundreds of pages of meetings of his. The newspaper accounts were some. But, no, if you look at the brief, there was a lot more than just newspaper accounts. I should have said, are you talking about the accounts that weren't translated? That's correct. Now, who was the trial lawyer here? Very experienced attorney. And was he unaware of the rules of the court on this? No, he was, and he made an attempt, in fact. He made an attempt. The question that I have, did he make an attempt before the trial? Yes, he was court appointed, and he filed a motion. He filed a motion requesting authorization for translators, which was granted by the court. How long before the trial? Well, early on, when you assume the representation, the motion is Do you know how long before? As soon as he was named, he filed a motion requesting that service. And how long was that? Does the record show that? Yes, the record shows that. I don't know it by memory. Was it months? Oh, I would say way more than just months. Okay. The problem was it was so many and so expensive that it was prohibited. But wasn't the government paying for that? Was he appointed counsel? He was appointed counsel, but the approval had not been to cover all of that, and there were so many hundreds of pages that it was practically impossible to comply with. The brief states all of the judge's comments, but the judge recognizes that that was impossible to comply with. And the court assumed The point that I'm getting, and I think you most of us get, that is that waiting for the trial to start, then trying to get these documents translated is not exactly the appropriate way. Well, what I submit to the court is that in this particular case, there were so many hundreds of pages to be translated that the rule should not have been applied so strictly. So what were you going to do, let in documents that weren't translated? Is that what you say? Well, the case law of this court says that reversal is warranted for a violation of the DOMES Act if the appellant can demonstrate that the untranslated evidence has the potential to affect the disposition of an issue raised on appeal. Here, the solution was simple. The government admitted that those hundreds of pages were basic to the defense of Gomez Gonzalez because it established that he was working, and it went against the idea that he was engaged in drug trafficking. So there was no objections from the government. It was the court that had an inflexible rule felt that if I admit this, I'm going to be reversed. But the proponent was Scrivoggio, and clearly the court had, based on what I have just quoted, what this case law of this court is, the court, all the court needed to say, do you stipulate and agree that if I allow you to let the jury consider the Spanish documents, you are not going to raise any issue concerning the admission of the untranslated documents? I don't understand that point. First of all, you're at 15 minutes. I don't know how much more time you need. Oh, I'm sorry, Your Honor. No, that's all right. But I don't understand the argument. If the documents had been admitted in their Spanish form and there was still a conviction, nevertheless there was still a conviction, and we were arguing this point here, we would have Spanish documents. That seems to me to be a clear violation of the statute. Well, it assumes that the documents would be part of an assignment of error. They became an assignment of error because the constitutional right of the defendant to proceed. Well, then your argument must be that it would have been crystal clear to any reasonable judge that there would have been an acquittal if these documents had been submitted. No, Your Honor. That has to be. No, no, because he was a proponent. And as a proponent, the judge could have easily stated to him, if I allow this, you're waiving any assignment of error on appeal that the admission of the untranslated documents requires reversal. If the claim was sufficiency here, we need to be able to see the evidence. Well, again, in this particular case, there's not a claim of sufficiency. So I think we're talking past each other. One last point before you go on to it. Was there any proposal made of a stipulation of several documents representing? That was suggested by the court. And the defense argued that, and the government agreed, that the sheer volume of the documents that reflected his daily activities really would not have been appreciated by the jury by a mere stipulation of a couple of documents. Well, you say a couple of documents. They represented a number of documents. That was proposed by the jury. Okay. If I may follow you on this, to Brian Santuagin. I submit to the court that there's something wrong when Brian Santuagin, a 23-year-old marijuana seller in Alberta that is offered a 12-year plea, exercises his basic constitutional right to trial and ends up with a life sentence. Perhaps this is the case for your honest, repeated admonitions and concerns. Well, mine have been defense, unfortunately. That is. But that doesn't help you too much. Well, okay, Your Honor. But this is the case where exercising your right to go to trial ended up in a sentence, a life sentence, when the government was willing to offer a 12-year plea. Now, I submit, Your Honor, that if Congress intended to include drug-related murders as part of a 28A41A1 offense involving the sale of narcotics, it would have specifically mentioned such an act as punishable under the statute. The only deaths that are punished by Section 841 are those resulting from drug overdoses. The prosecutor admitted to the court that the young felon was not being charged with murder. Murder that are carried out as a consequence of an 841B1 offense are covered by Title 21-848E1A. Now, the defendant has a right under the Fifth Amendment to presentment and indictment by the grand jury. The murder was clearly not part of the 841 violation. It would constitute a different offense that was not charged in the indictment. Title 843, the conspiracy statute, does not live on its own, does not have an existence on its own to make it have life because the 846 charge has to specify which one of the statutes of the subchapter the conspiracy was directed to. I submit to the court that if the government pretends to introduce in evidence a detailed presentation of a murder committed, that if it wants to present that at trial as part of its case in chief, it has to allege in the indictment that the conspiracy involved the 21-848E1A violation. Otherwise, it is limited to presenting evidence concerning the illegal purchase and selling of drugs that are not, 841A1 does not extend to murders. And if you look at the record, quite frankly, the evidence, there is more evidence presented concerning the murder than said Juan Ramos' marijuana sales in La Perla. So I submit to the court that that was clearly a violation of constructive amendment of the indictment. The jury hears all of this evidence concerning a murder that is not an element of the 841A violation. They obviously, by hearing it, are allowed to consider that evidence. They are never asked to determine whether or not he committed the murder. And then the court allowed something that should have been deferred to sentencing because the murder is really a sentencing factor, not a trial factor when all you allege is an 841A1 violation. And yet that they allowed these witnesses to sacrifice extensively to the murder, and yet when the defense, who had actually better evidence than the government, that it was Cascote who murdered Tetum, they were all cut off altogether. Colón-Gejo, Your Honor, with all due respect, Colón-Gejo, he was stopped when the prosecutor tried to cross-examine him concerning the other defendants that had pled guilty. The district court even said that that was irrelevant. And I submit to the court, if you look at the trial transcript, David Gejo did identify several people that sold drugs, and the prosecutor asked him, you know the people standing next to you selling drugs? And he said, the persons that pled guilty, yes. And what did the court say? We don't care about the other people who pled guilty. I don't want to hear that. Yet that was the questioning that the prosecutor was insisting on going into, on cross-examination that was clearly collateral, that was in fact irrelevant as the court correctly recognized, because the other defendants had already pled guilty. Refresh my memory a little bit. How did this murder evidence come into the trial? Well, they had several witnesses. The government presented it? Yes. On the rec? On the rec. Extensively. In fact, more evidence was presented concerning the murder than the drug-trafficking activities of Sergio Juan, which is why I submit to the court that a constructive amendment should be found, because they actually included a murder that is encompassed by 848 within 841 that is not punishable as an 841 offense. It was objected to. Oh, yes, it was objected. It was objected, and the court allowed Cascote to testify, about hearsay that was inadmissible. Willie Boy testified that some drug addict, that he didn't know the name, who had allegedly told him that he had disposed of the body after the murder, had told him that Sergio Juan had murdered him. But if what that drug addict did was dispose of the body after the murder, he wasn't a co-conspirator of the murder. He was going to testify after the fact. Can I just ask you one question? I didn't see any discussion in your brief about the case of Vega-Figueroa, our case from 2000, which seems to be directly on point and runs against your position. Is there anything you want to say about that case? I don't think it's directly on point, because Vega-Figueroa is cited by the government. It's a variance case. There's a difference between constructive amendment and variance. Variance is that you present facts different from those alleged in the indictment. Constructive amendment, which the government never addressed, refers to prosecuting you for an offense, not charge, in the indictment, for which the grand jury never indicted. So your claim is that, in effect, this was a constructive amendment because of the murder cross-reference at sentencing, is that it? Because he doesn't have a conviction for murder in this case. The cross-reference of the guidelines cannot expand the scope of the statute of 841. The cross-reference makes the murder a sentencing issue, which is why it should have never been allowed to be presented during trial. And then at sentencing, the district court committed several errors in considering that evidence that should lead this court to discard its credibility findings. Number one, Miriam Ramos-Gratelores, an attorney, and the attorney for the defendant interviewed and interviewed Mr. Rivera-Melendez. And Gratelores specified that he told that he was present when Tetón was killed by Cascote, that he was at the drug point, and that he saw when Cascote shot him twice. Now, Rivera-Melendez refused to testify at trial. Why? Because that admission, in essence, he was confessing to a felony, a misprisoned felony. So it was a statement against interest admissible. Yet the district court at sentencing said that that was hearsay. Well, hearsay is admissible at sentencing. He again also made comments that he was not in a position to discard Cascote's testimony because he was a cooperating witness. The court told Vélez, you actually need to compare a person that is not charged to a person that is cooperating with this gentleman. I can't. I can't. Well, why can't you discard the testimony of Cascote? Is it because you know that if you find Cascote unreliable, you're putting in jeopardy the convictions of the other defendants? That was not a basis to sustain Cascote's testimony concerning the dethroned having murdered. Flo was an employee of Cascote. He's the only one. There's only one witness that alleges to be a direct witness of the murder. That's Flo, an employee of Cascote. And the defense had two witnesses that provided direct evidence. The defense presented evidence that the sister of Cascote, the day Teton was murdered, filed a missing police report stating that Teton was missing in Guayamón and Catano when Teton was murdered in La Perla. Now, if Cascote was not the murderer, why would his sister Viviana Herrera file that missing person report providing false testimony to the police about where Teton had disappeared when you had all of the shots? You'd better move on to your... As a sentencing matter, the evidence was unreliable. As to, Your Honor, as to Santiago, again, here, this Santiago is a person that throughout the 12 years of this conspiracy was never tamed, was never arrested at the drug point, and not one bag of... What's his full name? Jose Hernandez Rosa, Your Honor. Okay. He, not one bag of Coyote was seized throughout that conspiracy that he allegedly sold. And I want to stress three areas that I consider fundamental. The admission of the narcotics that were never identified as drugs and the firearm that was found at his residence at the day he was arrested. The prosecutor admitted that the firearm had nothing to do with the La Perla conspiracy. The drugs were never, although the agent said they were drugs, they never laid a proper foundation that that agent had the necessary teaching and education to identify illegal narcotics. So that distinguishes that from the Moon case cited by the government. This is an officer whose, the foundation that was laid was that he was a 19-year veteran who had, had he worked with the DEA? Well, he was at the task force. I'm trying to distinguish the case from Moon, and I'm in the back. It is distinguishable, but there's no evidence. No, but I just want to get, what was his testimony about his involvement in drug task forces? Do you recall? He had been 19 years working for the police. He never qualified himself as being caught or having experience identifying drugs, and that's why I distinguish that case and the government's argument from the improper allowance of substances that were never identified properly as being narcotics. The allegation that the objection, a contemporaneous objection was not made is improper because the district court during trial had a standing objection, allowed a standing objection because there were many agents that testified about drugs that were never tested at the lab, and the court granted a standing objection. So Luis Arriba had perfect right to stand on that standing objection and not object specifically when that evidence was presented. Obviously, your Honor, the only evidence directly linking Hernandez Rosa to drugs and firearms is this event of the intervention at the residence. Well, there was plenty of testimony that he was a member of the conspiracy. There was uncorroborated testimony of cooperating witnesses that did testify that he was involved, but the improper admission of said evidence served to corroborate independently that testimony. And since the firearm was not part of the conspiracy, the district judge, when the counsel objected to the admission of the firearms on Rule 29 because the government had failed to establish a link with the conspiracy, that should have been granted, or at the very least, the firearm should have been stricken or the jury given unlimited instruction that the firearm could not be considered as part of the evidence concerning the conspiracy charge in the indictment. It was more a 404B that should have been requested by the government and provided by the court. Again, secondly, Hernandez Rosa was definitely harmed severely by the admission of Joanne Ducasis' co-conspirator in a hearsay statement that was inadmissible where she stated that drugs were coming into the piers through the president. Well, the president of the union at the piers was Hernandez Rosa. Again, this is highly damaging evidence because Hernandez Rosa also presented evidence that he was president of the union, worked at the docks for many years, and all of this evidence that was designed to be a defense that he wasn't involved in drug trafficking was inadmissible hearsay of Ducasis. All of that evidence was twisted around for the jury to conclude, oh, well, yeah, he's the president. The drugs that were being sold in La Perla came through him. Better wrap up. Yes, Your Honor. The final one, Your Honor, that I would like to mention to the court is the prior bad acts. The what? The prior bad acts instruction. Also, that included Santiago Hernandez Rosa. Hernandez Rosa never placed his intent into question. He didn't testify, Your Honor. The case law of this court said that under Rule 403, the government has to establish a need test. And here they had three witnesses providing, as you have stated, rather robust testimony that he was selling drugs, although it was uncorroborated. There was no need to then make reference to the fact that he had committed similar acts in the past. And really, there was no basis for the specific instances under 404B because he never placed into question the issue of intent, motive, or knowledge. Thank you. I will read. Yes. Good morning. I'm sorry. I thought the prosecutor was going to argue those cases. I understand. Well, I would like to emphasize that the evidence against Rosario, or not Rosario, was not overwhelming. In fact, it was insufficient to find him guilty of Count 1 and 4. Evidence of that is the fact that he was acquitted on Counts 2 and 3, and he was found guilty on Count 1 on a lesser amount than charge, and the same as to Count 4. He was found guilty on a lesser amount than charge. If it was not for the admission of evidence of his absence from the trial for several days, a finding of not guilty would have been made by the jury because out of more than 30 witnesses, only four mentioned Mr. Rosario. Three of those witnesses were not believed by the jury, and it shows on the verdict because three of the witnesses stated that Mr. Rosario dealt with cocaine and marijuana as a seller, but the jury discredited those testimonies when it found that he sold zero amounts of cocaine. But didn't Mr. Ortiz testify that he saw your client sell drugs at La Boma at least five times? Yes, he said marijuana and cocaine were not by the judge. So why is that enough for the jury to convict him? Well, I conclude that by the jury finding that he did not sell cocaine, that they must have discredited the testimony of Mr. Ortiz who said that he was selling marijuana and cocaine. Maybe they thought he was only selling marijuana based on the evidence. Maybe, but it could also be a logical conclusion that if a witness says that he was selling cocaine and marijuana and the jury discredited that he was selling cocaine, that the jury must have discredited that testimony and found him guilty on the testimony of the other witness who only said that he sold drugs at La Perla, which was a police officer. And it was only that, very vague, with no time frame, no details, nothing else. Just an officer who said, oh, he was a seller at La Perla, without any more. He didn't just say La Perla. He said a specific known drug point at La Perla. Yes. Well, I think that's fairly convincing evidence if nothing else has taken place. Well, Your Honor, the thing is that there was extensive testimony here, primarily by Mr. Juan Jose Hernandez Cascote, who was the leader, and by Mr. Flo about who were the members of the association, who worked for whom, because there were different brands, different owners who were working together, but each one had their own brand and their own runners, their own sellers. And neither Flo nor Cascote places Mr. Rosario as a seller for any leader or working with any particular runner. In fact, the drugs that were allegedly taken from him when he was arrested had no labels identifying or linking the drugs to any particular brand. And it was a very extensive testimony about the importance of branding in this drug organization. So here's my question. Juries are permitted to render compromise verdicts. We don't know what happened in the jury. And I think on one take, it could be exactly as you say, that the jury did not find that he possessed with the intent to distribute any cocaine. But there was certainly testimony that he did. Why isn't it just as plausible to assume that the jury couldn't agree on the amount, which is there was a specific request for amount, and so they said no amount because they couldn't agree. But they still nevertheless convicted him of possession with intent to distribute. Well, the thing is they had the woman presented the particular drugs that were taken from him, and the jury saw the cocaine bags, about 17 cocaine bags, and about 30 marijuana bags. So the jury did know, the jury did see microdetamination of the officer. So there was evidence upon which the jury could have found a quantity. Yes. But nevertheless decided not to. Why isn't it just as plausible that that means they couldn't reach unanimity on that point, so the unanimity that they came up with is we're not going to list an amount and just take it as a default position. What's implausible about that? Well, that they had a certain amount before them. There was evidence of the exact amount. There was lab evidence about the quantity, specific quantity that was seized from him. Okay. Appreciate it. And another important fact is that out of hundreds of hours of videos, out of at least 17 police officers who testified about their daily incursions or visits to La Perla to gather information, they never saw this person. In fact, the government tried to ask Officer Jaume and Officer Salgado, who was the agent in chief, to identify Mr. Palo Rosario, and they could not identify him. The hours of video would have shown that he was there, because if he was at La Boveda, the camera was pointing right to La Boveda. There were, I would say, 100 hours of video at least, different days, different hours, where you could see hundreds of people going in to buy. You could see 20 or maybe 30 people selling drugs there. So they had a lot of information, a lot of access to this place, and they were never able to pinpoint him, to find him. Only vague testimony. Very vague on Mr. William Ortiz. Oh, I saw he was a member. That's a label. He did not say he worked for this one or he does this. Only I've seen him saying about five times. And it is not until the judge asked him at the end of his testimony, hey, and what did he sell? And that is when he says, well, he was selling marijuana and cocaine. But no other detail. No other detail. It's basically impossible to cross-examine such a vague testimony. Was La Boveda a drug point? The evidence shows that La Boveda was a drug point. What does the evidence show us, and who controlled that drug point? Well, the evidence shows that Mr. Cascosa, Juan Jose Hernandez, controlled the drug point through violence, and that there were others. He was one of the owners, and there were other owners. But did the evidence show that the conspiracy was charged and proven was the one that controlled the drug point? Well, the evidence wanted to show more than that drug point. They were alleging several drug points, at least two. I'm talking about the drug point at La Boveda. Yes, those owners stated that they controlled that place there and that everybody had to work under a brand or somebody. But Mr. Rosario had no branding in the drugs allegedly seized from him. He could have been another working on his own, if that was true, what the police officers testified. He didn't have to be a member of this particular organization. Just because Mr. Ortiz says he was a member, a label, that's just a label. Anybody can say that. In fact, it's a way in which he can shield from cross-examination because he has not testified anything about this person in his 302s, so all of a sudden he goes, oh, he was a member. So that's coupled with the fact that the other officer who saw that, who testified that he was selling drugs, was very vague. No details, no date, nothing to be able to make a cross-examination, no previous testimony regarding that fact. Basically, if it wasn't because of the court-allowed introduction of very prejudicial evidence of his absence from the court during trial, I believe that the jury would have found him not guilty. Thank you. May it please the Court. William Glasser for the United States. I'd like to briefly begin with Defendant Rosario Perez and then move on and address the other defendants in the order that they were addressed. The evidence does not show that Mr. Rosario was convicted only because of the evidence of his flight from trial. Now, the government's position is that the district court actually did not need to strike the evidence of that flight because it was admissible. However, in any event, the district court did strike it and specifically told the jury that the evidence was not to be taken into consideration at this time. The court said that at page 2187 of the appendix very soon before giving the jury instructions. And again, when giving the jury instructions, at page 2200 of the appendix, specifically said that evidence that I have stricken from the record is not to be considered. So the jury was twice instructed that it was not to consider that flight evidence. So although we believe it was admissible, it was not considered by the jury if the jury, as presumed, followed its instructions. Was there any evidence about the practice of how drug courts are run? Yes, Your Honor, there was evidence to that effect. And so turning to the sufficiency of the evidence claim, and also it relates to the prejudice of the flight evidence, the evidence showed that in order to sell drugs within La Perla, you had to be connected in some way with the organization. The leaders in the drug conspiracy were able to control the conduct of all of the sellers at the La Boveda drug point. For example, if they crossed the line, they could be told to get back across the line and even face punishment by the conspirators. Flo, one of the key testifying co-conspirators, testified that in order to be a seller within La Perla, you couldn't just walk in, but rather you had to be someone who developed a relationship with someone within the drug organization. So although Mr. Rosario posits that he possibly could have been operating on his own, the evidence overwhelmingly demonstrates that these were not lone operators at the La Boveda point, but rather they were controlled by the organization. Furthermore, Willie Boy, or Ortiz, testified that the sellers at the drug point would pool their money in order to hire the lookouts. So there was evidence that in any event, Mr. Rosario, if he's one of those people who is pooling his money to pay for the lookouts, is conspiring with other members of the organization for the purpose of distributing drugs. Did the prosecutor at closing emphasize the point that Judge Torreya asked about? That is, that there was a monopoly and in order to be selling, you had to be allowed in by those people? Your Honor, I don't recall if the prosecutor emphasized that with respect to Mr. Rosario Perez specifically. But that point was made, that the way the conspiracy worked was that there were the big shots who controlled everything that went on, and that you couldn't just walk in and sell drugs. And the evidence established that overwhelmingly. Was there evidence that there were any independent sellers or rival distribution networks in La Perla? Your Honor, to the best of my recollection, there was some evidence from Cascote that he was concerned about some rivals from outside of La Perla who were trying to come in and compete. And that evidence wasn't really fleshed out to any extent, but I do recall, that's the one thing I do recall, is that he mentioned that there was some tension with outside groups who were trying to compete, but there wasn't any evidence that any of the sellers, specifically at La Boveda, were unassociated with the conspiracy. If I may now turn to the issues raised by the other defendants, and starting with the 404B issue, as the public counsel did, the district court instructed the jury not to consider the 404B evidence that was actually never given. And so if I can just point the court to exactly what the district court said. The district court, this is at page 2034 of the appendix, said, you are about to be presented documentary evidence that defendants Jorge Gomez-Gonzalez and Santiago Hernandez-Rosa committed similar acts, similar to those charged in this case, previously committed acts. That's as far as the district court got, because there was an interruption and the government decided later not to pursue that evidence. And the district court then instructed the jury later, the instruction which I began is to be disregarded at this time. It should not be considered at this time. Now, Appellant points out that the district court said, at this time. However, again, as I mentioned earlier, page 2200 of the appendix, the district court specifically said that items that had been stricken or excluded from evidence should not be considered. So there's no evidence that the jury considered this sort of, it wasn't even 404B evidence, it was sort of the hint that 404B evidence was coming. But in any event, the evidence against the defendants was overwhelming to the extent that any potential error was harmless. Are you also referring to the defendants that they won, Ramos, evidence against him on the murder issue? Your Honor, I wasn't addressing that at this time. I'll wait. Sure, I think the evidence is overwhelming with respect to the murder as well, or at least sufficient to, that the district court did not clearly err with. I'm not going to ask you about whether it was overwhelming or not. I'm going to ask you why it was presented to begin with. Sure, and I'm happy to address that, Your Honor. Take your time if you want. All right, well, if I may, to wrap up the evidence, the 404B evidence, and that relates specifically to Mr. Gomez-Gonzalez and Mr. Hernandez-Rosa. The evidence against them, they have not challenged the sufficiency of the evidence on appeal. And the evidence certainly did come primarily from co-conspirators. There weren't drug seizures aside from Mr. Hernandez-Rosa's search of his house, which, again, he challenges that evidence as well. But aside from those drugs, there weren't drug seizures specifically related to those men. However, if you look at the summary of the evidence at the beginning of the government's brief, there was testimony from multiple co-conspirators that Mr. Gomez-Gonzalez and Mr. Hernandez-Rosa had participated in the drug conspiracy. And, in fact, there was evidence of people who had seen them with drugs. So the evidence was sufficient for the jury to credit that testimony and convict them regardless of any potential prejudice from the 404B evidence that never really came to fruition. Was there a contemporaneous objection with respect to the aborted 404B instruction? Your Honor, there was an objection to the 404B evidence to begin with. After the district court said it was going to admit it and then the government withdrew it and the court gave a corrective instruction, there was no further objection. There was no motion for mistrial saying, well, the jury heard something. There was, at that point, no contemporaneous objection to the evidence having come in. Now, granted, there was an objection to the evidence to begin with, but after the court gave its curative instruction, there was no further objection. To turn then to the evidence of the murder, as Judge Torrey asked about, and why that evidence came in. Again, this is something where I think there's a disagreement between the parties as to whether there was a contemporaneous objection. Nowhere during the trial itself was there an objection to the testimony coming in that Mr. Sesayawan committed the murder of Kayton. Now, it's possible that I missed something and that there was a prior motion in limine to exclude that testimony. However, from reading the trial transcripts, I nowhere saw an objection to that evidence coming in. And even on appeal, Mr. Sesayawan has not raised the argument that it was not admissible as evidence in furtherance of the drug trafficking conspiracy. So the issue of whether or not it was admissible is not really on the table and hasn't been disputed. Now, the issue of the alleged constructive amendment or variance, that relates to Mr. Sesayawan's argument that the government had to have charged this under Section 848 and actually sought the life imprisonment mandatory minimum and could not introduce evidence of murder if it's merely charged as an 841 offense. As the court pointed out, that seems inconsistent with Vega-Figueroa, and whether it's labeled a constructive amendment or a variance, the facts in Vega-Figueroa in this case are essentially identical, that there was an 841 charge, and evidence of a murder committed in furtherance of that conspiracy was admitted. Now, I believe Vega-Figueroa was an 846 conspiracy. This was an 860 conspiracy, distribution within 1,000 feet of the school. But the law is the same in all other respects. What about the exclusion of the Ramos testimony, that Rivera saw Cascati commit the Teton murder? That might have been error, right? Your Honor, there are two, I think, I'm hoping I'm addressing your question, there were two witnesses, one who was excluded and one who actually testified that Cascati committed the murder. Hold on, I'm talking about the Ramos testimony. Okay, right. That was excluded, right? The attorney. Yes, sir. That was correctly excluded, and it was harmless, because the jury was not required. Why was it correctly excluded? Isn't it testimony about a statement contrary to penal interest? No, Your Honor, at least the district court did not abuse its discretion in not admitting it under that exception, under 804. Because the first requirement under the statement against penal interest exception is that the statement must be such a statement that a person would not make it unless the person believed it to be true because it exposed that person to criminal liability. Now, there are many reasons why Mr. Rivera Melendez, who was the hearsay declarant, might have wanted to point the finger at Cascati. He might have been afraid that he was actually going to be held accountable for that murder. He pleaded guilty at this point already. But he might have been concerned that that would be an issue that would be held against him. And he also might have assumed that this closed-door meeting with two defense attorneys was not something that was likely to be related to prosecutors and that he couldn't be, therefore, held liable for that statement if it, in fact, did implicate him. But the primary reason for that. That seems kind of odd. I mean, I would have thought the testimony contrary to penal interest would be admissible as a hearsay exception, even if the person might have had a different subjective view of the significance of that, of what he was saying. Your Honor, the key inquiry under that first problem of Rule 804 is whether someone would not make it unless they believe it to be true. In other words, that there's sort of no good incentive for lying. And here there are many incentives, many very likely incentives for lying. And the district court didn't abuse its discretion in excluding it. Additionally, the second requirement is that there has to be corroboration. And in this case, the court was very concerned that Mr. Rivera-Melendez, he had already pleaded the fifth, so he was not going to be testifying. And Ms. Ramos, the attorney, was not able to testify about anything other than those circumstances where Mr. Rivera-Melendez pointed the finger at Cascote. And so the district court rightly concluded that it was difficult to test the credibility of the underlying hearsay statement because Ms. Ramos couldn't testify to anything other than the fact that it took place in this attorney interview. But in any event, the error was harmless because— Before you get there, I don't think the parties discussed Williamson, the Supreme Court 804 case that seems to me to be somewhat on point here, if not exactly on point. And I don't expect that you should know the case because I don't know it very well either. But it seems to me the point of that case is that what is not hearsay or is an exception to the hearsay rule is testimony that is inculpatory as opposed to testimony that, you know, it wasn't said to one, which is somewhat collateral. But that's what we're dealing with here, it seems to me. Right. Yes, Your Honor. The crux of the statement is whether it's inculpatory as to the declarant. Correct. It's not illegal to be present at the scene of a murder. Exactly, Your Honor. And arguably, you could certainly make the argument that under a sort of Pinkerton liability theory, that saying that you were— someone who was a part of the conspiracy that you joined committed a murder, that you could theoretically be held liable for that. Okay. But in this case, the government at no point sought to hold anyone liable for murders committed in furtherance of the conspiracy. No, but the statement that I thought we were talking about is inculpatory as to set a woman. And I think Williamson says that doesn't even come under the exception. That's correct, Your Honor. I would certainly agree with that, that this was not an exculpatory statement for me or an inculpatory statement to him. It was exculpatory as it relates to another member of the conspiracy. So I would just like to ask this, Mr. Castro-Lang, would you mind just giving us a supplemental memo on whether Williamson has anything to do with this issue? Do you need more than a week? Simultaneous, or would you prefer to do it in order? All right, simultaneous? Yes, Your Honor. No more than three to five pages. Williamson, Supreme Court case from 1994, 512 U.S. 594. Certainly, Your Honor, we'd be happy to address that further. But in any event, the error, if there was one, I still haven't heard why this murder was brought up by the government. Your Honor, it was brought up by the government as an act in furtherance of the conspiracy. It gave the jury sort of a view of the scope. Did they give a date when it took place? Yes, Your Honor. The date was included. So it was not charged in the indictment. But, again, the Vega-Fedorova case says that you don't have to allege all the overt acts. In fact, the Supreme Court has said that you don't have to allege every overt act that you prove. Again, there is an argument that it was unfairly prejudicial under Rule 403. However, that argument was not made at trial and isn't being made on appeal. And the jury was never tasked with determining whether or not Mr. Sechianwan committed that Teton murder. So there can't be any prejudice to him with the fact that he wasn't able to bring in this testimony from other co-conspirators demonstrating that possibly it was Mr. Cascode who committed the murder. And if I may, then briefly— I'm not sure that I understand that. I mean, the government made a big deal at the trial about the Teton murder. Yes, Your Honor. So this was sort of a central issue. And it seems to me difficult to dismiss it as being irrelevant, which is what it sounds as though you're doing. Your Honor, it wasn't relevant to the determination that the jury— the jury did not have to find—it was relevant, but the jury did not have to find that this murder was committed. That was something that the district court later determined. Well, that seems to me that it was presented to prejudice, the jury, in that way. Your Honor, certainly there would be some prejudice flowing from that. Some prejudice? Yes, Your Honor, but not unduly prejudicial under Rule 403. And, I mean, this court has many times concluded that evidence of murders committed in the course of drug trafficking conspiracies are admissible under Rule 403. And, again, that's not something that's really before the court. The only issue is this constructive amendment claim. Are you arguing that the testimony of the conspiracy under Secretary Satterwin was so overwhelming that any error in excluding the Ramos testimony would be harmless? Your Honor, sort of. But I'm primarily arguing that the jury wasn't tasked with making that determination. So, really, where the evidence was extremely relevant and actually a determination about the murder was made, that was at sentencing. And at sentencing, the district court did, again, hear from Mr. Colon Geigel, or Colon Geigel, who testified that Cascode had committed the murder. At that sentencing, Ms. Ramos did not come and, again, make that previously excluded hearsay statement. But there was, for purposes of the sentencing determination, more than adequate evidence that the district court's determination that Mr. Cechiolan committed the murder was not clear error. That evidence came from Flo, who said that he observed the murder. He saw the Taton killing. That evidence came from Cascode, who said that Mr. Cechiolan admitted to him that he had killed Taton. The evidence came from Ortiz, who heard from a junkie, a member of the conspiracy, immediately after the murder that had been committed by Cechiolan. And it came from the victim, Taton's mother, who heard again from the sellers at the La Boveda Point the very next day that the killing had been committed by Mr. Cechiolan. So that was more than adequate evidence for the district court to make the determination for sentencing purposes that Mr. Cechiolan committed the murder. To make sure that I don't leave anything uncovered, to briefly address the documents that were untranslated and were not admitted. I think counsel's understanding differs from mine on whether or when the translation actually began to take place. Certainly there does seem to be evidence that there was permission to conduct translations that was sought prior to trial. How long before? Your Honor, I don't have the docket sheet in front of me, so I'm not able to say exactly when. But the evidence from trial certainly indicates that these contested exhibits were not translated at any point before the admission was sought by the defendants. What was the remedy that the defense counsel sought as a result of being in this situation with the untranslated documents? The remedy that counsel sought was to have the documents admitted untranslated. Initially the district court granted some leeway and actually delayed deliberations by six days after closing argument to allow the translations to continue taking place. So there was no request for further time? No, Your Honor. The request was that they be admitted in the Spanish language, not the English language. And again, the Supreme Court has said in the Taylor v. Illinois case, for example, that the right to compulsory process is something that depends on the defendant's initiative, and it's not the court's or the government's responsibility to ensure that the defendant's evidence is prepared beforehand. The defense counsel very easily could have filed a motion in limine seeking the ruling on the admissibility of these documents before trial. That would have at least allowed, I mean, this trial spanned six or seven weeks. That would have at least allowed the translators to be working throughout the entirety of the trial. However, at appendix at page 1429, counsel specifically said this is why, when the court excluded some evidence, said this is why I don't seek translation beforehand, because you might exclude it. Well, that's not an adequate justification for not translating these voluminous exhibits that could have been translated beforehand. To briefly address the testimony from Officer Sanchez, who testified about the drugs that were seized in Mr. Hernandez-Rosa's house, the evidence indicated that he had been a member of the DEA task force for I believe it was nine years. So he did testify that he had prior experience with drugs. The problem seems to be that he didn't testify as to his basis for concluding that these were drugs. That's correct, Your Honor. If he had been an expert, he would have had to be – there would have been an extensive colloquy to establish his basis. However, this is something that was unobjected to. It's here on plain error review. And so it's difficult to say that the district court clearly erred in – or pardon me, plainly erred in failing to sua sponte grant a mistrial then and there when at the time the parties most likely believed that there was going to be later evidence actually showing the drug testing. And in any event, the notes to Rule 701 say that, and this court's Moon case as well, say that an experienced law enforcement officer can testify as a lay witness to his recognition of controlled substances. Again, I agree that there wasn't – basis for making that determination. However, he did testify that he had been involved in narcotics investigations for the last, I believe it was, nine years with the DEA task force. Would it make any difference if the evidence were insufficient – if his testimony were insufficient to identify these as drugs? Your Honor, I don't believe it would make a difference. There's still enough evidence of the other conspiracy. There was testimony, for example, from Cascote, who said that I actually helped prepare heroin with Mr. Hernandez-Rosa. So there was direct testimony saying that he had been involved in this drug conspiracy. So these seizures, which were relatively small quantities, did not have any effect on the verdict. So certainly it's his burden of showing prejudice under plain air review. This white powder and the gun were taken for lab testing and for fingerprinting. Your Honor, there's – this is where the evidence – it doesn't ever show that they were actually – that drugs were actually tested at the lab. That's where I'm going. Right. They were seized for that purpose. Yes, Your Honor. Is there anything on the record as to why this wasn't followed through? No, Your Honor. There's no indication, and I was not able to ascertain any why, whether this was a mere oversight or – Well, why doesn't this raise a presumption that they weren't what the government claims? Your Honor, it's his burden on plain air review to show prejudice, and he hasn't demonstrated, for example, that there's been subsequent testing that these were not drugs. So I don't think the presumption can go against the government when it's his burden of establishing prejudice. Who was the witness that you just referred to that said he was selling with Cascote? Oh, so Cascote was the person – was the witness who testified against Mr. Hernandez-Rosa. So it was he himself. That's correct, Your Honor. Yes. There are other issues raised by the defendants that I'm happy to address if the court has further questions. What is the evidence generally against Gomez-Gonzalez? Your Honor, the evidence generally is that there was testimony from people such as Cascote and Flo that he was a big shot in the organization. There is testimony that he – one witness, I believe this was Ortiz, had seen him receiving a bag containing 60 kilograms of cocaine. There was testimony that he had given out – he had distributed heroin to junkies to sort of test the heroin before it was actually sold for profit. And there was evidence that he was someone who went to the La Boveda point and would tell people to step back across the line, and that he would tell them to disappear when an important official was entering La Perla. So that's the primary evidence against Mr. Gomez-Gonzalez. And, again, the sufficiency hasn't been challenged, but the evidence was more than sufficient to establish his guilt. The court has no further questions. I'll give you my time. Thank you.